## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Nicolas J.

      Plaintiff,

v.

Kilolo Kijakazi, Acting Commissioner of
Social Security,

      Defendant.

Case No. 20-cv-1340 (WMW/ECW)

**REPORT AND RECOMMENDATION**

This matter is before the Court on Plaintiff Nicolas J.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 27) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's ("Defendant") Motion for Summary Judgment (Dkt. 31). Plaintiff is seeking judicial review of a final determination by the Social Security Administration denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") Benefits under Sections 216(i), 223(d), 1611 and 1614(a) of the Social Security Act. This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends that Plaintiff Nicolas J.'s Motion for Summary Judgment be denied, and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment be granted.

### I.    <u>PROCEDURAL BACKGROUND</u>

On February 3, 2016, Plaintiff filed an application seeking DIB and SSI benefits

alleging disability beginning for both on August 20, 2015.  (R. 289.)[1]  Plaintiff's application for disability insurance benefits was originally denied and then again denied upon reconsideration, and Plaintiff requested a hearing by an administrative law judge. (R. 182.)

Administrative Law Judge Micah Pharis ("ALJ") held a hearing with Plaintiff, who was represented at the hearing by counsel, on August 21, 2018.  (R. 289.)  On March 8, 2019, the ALJ issued an unfavorable decision.  (R. 301.)  The Appeals Council remanded the decision back to the ALJ to evaluate new evidence regarding Plaintiff's physical and mental impairments, and to further evaluate Plaintiff's mental impairments. (R. 312-13.)

On November 20, 2019, the ALJ again rendered an unfavorable decision against Plaintiff.  (R. 10-30.)  In making this determination, the ALJ followed the five-step sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520 and 416.920.  At the first step, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period from the alleged onset date.  (R. 12.)  At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "lumbar degenerative disc disease status post laminectomy and decompression with implantation of a spinal cord stimulator, cervical degenerative disc disease, asthma, obesity, bipolar disorder, major depressive disorder, psychosis-not otherwise specified ('NOS'), anxiety disorder, and post-traumatic stress disorder."  (R. 12-13.)

At step three, the ALJ found that Plaintiff did not have an impairment or

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. 24.

combination of impairments that met or medically equaled the severity of one of the

listed impairments in 20 CPR Part 404, Subpart P, Appendix 1.  (R. 13.)

The ALJ then assessed Plaintiff with the following residual functional capacity

("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the individual would need to use a cane while walking but not while standing in place.  The individual may never climb ropes, ladders, or scaffolds; and may occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl. The individual may occasionally reach overhead.  The individual may have no exposure to concentrated levels of airway irritants, vibration, unprotected heights, or hazards.  The individual is limited to simple routine repetitive tasks at a nonproduction rate pace and may have occasional superficial contact with supervisors, coworkers, and members of the public.  By superficial, I mean rated no lower than an eight on the "Selected Characteristics of Occupations" people rating.

(R. 16.)

The ALJ concluded, based on the above RFC and the testimony of the vocational

expert ("VE"), that Plaintiff could not perform his past relevant work as

a golf pro, DOT#153.227-018, light, SVP 7 work (medium per the DOT); bartender,

DOT#312.474-010, light, SVP 3 work; and manager oil changer, DOT#915.134-010,

light, skilled work (heavy as performed).  (R. 28.)  The ALJ also determined after

consulting the VE at the hearing that given Plaintiff's age, education, work experience,

and RFC, there were other sedentary unskilled jobs that exist in significant numbers in

the national economy that he could perform the requirements of, including: (1) the

representative occupations of document preparer, DOT#249.587-018, 12,000 jobs

nationally; (2) addressor, DOT#209.587-010, 13,000 jobs nationally; and

3

(3) cutter/paster, press clippings, DOT#249.587- 014, 7,500 jobs nationally.  (R. 29-30.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 30.)  Plaintiff requested review of the decision and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-6.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

On July 31, 2015, Plaintiff presented to the emergency department with pain in his left leg.  (R. 765.)  It was noted that he had undergone a L4-5 hemilaminectomy in May of 2015.  (*Id.*)  Plaintiff claimed that his pain medications had been confiscated at a bar and that he had been without pain medications for many days.  (*Id*.)  Plaintiff complained of a shooting type of pain into his buttock and left leg.  (*Id.*)  He was able to walk, but this increased his pain.  (*Id.*)  His psychiatric and neurological examinations were normal. (R. 768.)  Plaintiff was able to move his lower extremities on his own, but palpation of his leg elicited pain.  (*Id.*)  Plaintiff claimed that Neurontin[2] and Flexeril[3] medications

---

[2]    Neurontin is "a medication used to help manage certain epileptic seizures and relieve pain for some conditions, such as shingles (postherpetic neuralgia)."  *Neurontin side effects: How do I manage them?*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/epilepsy/expert-answers/neurontin-side-effects/faq-20057893 (last visited January 19, 2022).

[3]    One of the brand names for cyclobenzaprine is Flexeril, which "is used to help

had not been helpful for his pain.  (R. 769.)  Doctors believed that Plaintiff may have been there seeking pain medication with respect to oxycodone.  (R. 768.)

On August 5, 2015, an MRI of Plaintiff's lumbar spine showed a new disc extrusion/fragment at L5-S1.  (R. 771, 772, 774.)  On August 7, 2015, Plaintiff underwent a redo of his left hemilaminectomy.  (R. 781.)  His preoperative examination showed that his back was tender with poor range of motion, he exhibited weakness in his left leg, and his psychiatric exam showed that he exhibited an appropriate affect.  (R. 778.)

On November 12, 2015, Plaintiff underwent another MRI of his lumbar spine.  (R. 878.)  The MRI showed post-procedural changes at L5-51 level, a mild broad-based disc bulge was seen again, along with mild canal stenosis, mild right foraminal narrowing, mild to moderate left foraminal narrowing, mild canal stenosis, and minimal bilateral foraminal narrowing at L4-5.  (R. 891.)

On December 22, 2015, Plaintiff was seen by Erik Ekstrom, M.D., regarding his lower back and left leg pain.  (R. 890.)  Plaintiff had undergone physical therapy, acupuncture, surgery, chiropractic care, massage and one injection.  (R. 891.)  Plaintiff's medications included Neurontin, oxycodone 10 mg three to four per day, duloxetine, ibuprofen, naproxen, and BuSpar.  (*Id.*)  His physical examination showed an appropriate mood and affect.  (*Id.*)  Plaintiff could toe walk, but he was unable to heel walk due to his

---

relax certain muscles in [the] body. It helps relieve pain, stiffness, and discomfort caused by strains, sprains, or injuries to [the] muscles." *Cyclobenzaprine (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last visited January 19, 2022).

back pain on the left heel, his tandem gait was normal, and his Romberg was normal. (*Id.*) Plaintiff also demonstrated pain-limited weakness. (*Id.*) The plan was to go forward with a left S1 nerve root injection, followed by physical therapy, and Plaintiff was given a prescription of oxycodone 10 mg to take a max of four tabs per day. (*Id.*)

On December 24, 2015, Plaintiff underwent a fluoroscopically-guided, contrast-controlled, left S1 nerve root injection, related to his lower back and leg pain. (R. 884.) Plaintiff noted 60% pain relief three hours after the procedure and 0% pain relief one week after the procedure. (R. 886.) Plaintiff asserted that the pain was in his lower left back and rated that pain 5 out of 10. (*Id.*)

Plaintiff underwent physical therapy in January 2016, but stopped after 3 out of 12 sessions because he found no pain relief with physical therapy. (R. 1097-1108.)

On January 11, 2016, Plaintiff was seen for acute pain. (R. 888.) The root injection that had previously been provided to Plaintiff provided him with short-term relief. (*Id.*) It was noted that he had finished with his oxycodone medication two weeks early, but Plaintiff claimed that he needed more medication due to his pain. (*Id.*) Plaintiff's gait was antalgic and he exhibited ataxia with a bend flexed forward stenotic gait and a left-sided limp. (*Id.*) There was pain-limited weakness through the lower extremity exam and no significant neurological weakness. (*Id.*) It was noted that continued physical therapy was not recommended based on Plaintiff's claims that it increased his pain. (R. 889.) A possible lumbar fusion and decompression surgery was discussed. (*Id.*) Use of a Medrol dosepak was also discussed to decrease his inflammation. (*Id.*)

6

On January 18, 2016, Plaintiff was seen for back pain and vomiting. (R. 1109.) His psychiatric examination showed a normal affect and normal speech. (R. 1112.)

On March 7, 2016, Plaintiff underwent a left L5 nerve root injection for pain relief. (R. 1051, 1338.) On March 25, 2016, Plaintiff was seen by Steven Stulc, MD, for his chronic left leg pain. (R. 1048; 1335.) Plaintiff reported good, but temporary relief from his two decompression surgeries in 2015. (*Id.*) Plaintiff described significant debilitating pain in his back and left leg in an S1 distribution; associated a multitude of neuropathic features including burning, numbness, tingling, and temperature changes; had undergone several epidural injections subsequent to his surgeries with very minimal improvement; he was on higher dosages of neuropathic agents; and was taking narcotic analgesics. (*Id.*) His pain was constantly present, but was worse with mechanical activities. (*Id.*) Plaintiff claimed that he was somewhat incapacitated by his pain. (*Id.*) No allodynia was present, there was a negative straight leg raise, and negative hip provocative maneuvers. (*Id.*) It was noted that a recent lumbar exam had been performed showing significant chronic modic changes at LS-S1 with severe disc degeneration; left LS neural foraminal narrowing; and annular tears, and disc degeneration at L3-4 and L4-5. (*Id.*; *see also* R. 1053.) Other than the neural foraminal narrowing, there were no other overt areas of neural compression. (*Id.*) The use of a spinal cord stimulator was discussed, and Plaintiff represented that he "really wanted" to pursue using the stimulator. (R. 1048-49.)

On April 4, 2016, Plaintiff was seen by a nurse practitioner for lower back pain and extremity pain. (R. 1333.) The focus of the appointment was a medication review.

(*Id.*)  He was continuing to take four to six 10 mg oxycodone daily to help with his pain.
(*Id.*)  He was given a one-month supply of his oxycodone 10 mg tabs and a couple extra
than his previous refill.  (*Id.*)  He was also instructed to follow up with MAPS Pain Clinic
in Maple Grove, which would take over his chronic pain medication.  (*Id.*)  His
examination showed that he walked with a single-handed cane and had antalgic gait; he
had difficulty with heel and toe walking, but was able to do it with a tandem gait ataxia.
(*Id.*)  Romberg test had a mild to moderate sway noted.  (*Id.*)  There was no loss of
sensation in the Plaintiff's lower extremities.  (*Id.*)

On April 6, 2016, Plaintiff was again seen by a nurse practitioner for lower back
and lower extremity pain.  (R. 1047.)  It was discussed that Plaintiff was being considered
for a possible spinal cord stimulator trial, he was not deemed a surgical candidate, and
multiple injection therapies in the past had not been successful in alleviating his pain long
term.  (*Id.*)  Plaintiff was set up for his mental health exam prior to his stimulator trial.
(*Id.*)  In addition, the nurse practitioner and Plaintiff discussed the amount of oxycodone
Plaintiff was taking for pain management.  (*Id.*)  Plaintiff's examination showed that he
did walk with a single-handed cane and an antalgic gait.  (*Id.*)  Plaintiff had difficulty
with heel and toe walking, but was able to do it, he did have tandem gait ataxia, and his
Romberg test had a mild to moderate swaying noted.  (*Id.*)  While Plaintiff was noted to
have chronic narcotic use with oxycodone, he was given another prescription for the
medication.  (*Id.*)

On April 8, 2016, state agency psychologist Amy Johnson, PhD, opined regarding
Plaintiff's mental RFC.  (R. 236.)  The consultant found that Plaintiff was not

significantly limited with respect to: carrying out very short and simple instructions; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; his ability to make simple work-related decisions; his ability to complete a normal work day; the ability to ask simple questions or request assistance, being able to maintain socially appropriate behavior; being aware of normal hazards and taking appropriate precautions; traveling and taking public transportation; and making realistic goals and plans independent of others. (R. 236-38.) Plaintiff was found to be moderately impaired as to: being able to understand, carry out and remember detailed instructions; maintaining attention and concentration for extended periods; being able to interact appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. (*Id.*) The mental RFC assigned to Plaintiff was as follows:

> Claimant has the mental capacity to understand, remember, and follow simple instructions. Cl[aiman]t is restricted to work that involves brief, superficial interactions w / fellow workers, supervisors and the public. Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, cl[aiman]t is able to sustain attention and concentration skills to carry out work like tasks with reasonable pace and persistence.

(R. 238.)

As part of her July 29, 2016 reconsideration analysis, state agency psychologist Mary Sullivan found similar limitations and the following RFC:

> Claimant has the mental capacity to understand, remember, and follow simple instructions. Cl[aiman]t is restricted to work that involves brief, superficial interactions w/fellow workers, supervisors and the public. Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, cl[aiman]t is able to sustain attention and concentration skills to carry out work like tasks with reasonable pace and persistence. RECON: affirm MRFC.

(R. 277-79.)

On April 11, 2016, state agency consultant, R. Fife, MD found that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds; could stand and and/or walk for a total of 6 hours in an 8-hour work day; could sit for 6 hours out of an 8-hour work day; had an unlimited ability to punch or pull; could occasionally climb ramps and stars, balance, stoop, kneel, crouch, and crawl; could never climb ropes or ladders; had no manipulative, visual, or communicative limitations; was to avoid concentrated exposure to wetness and vibration; and was to avoid even moderate exposure to hazards such as machinery and heights. (R. 234-35.) On July 29, 2016, state agency consultant Gregory Salmi, MD found the same limitations on reconsideration, except that he also found that Plaintiff was limited as to overhead reaching. (R. 274-76.)

On April 26, 2016, Plaintiff's therapist Lewis Sego, MA/LMFT, noted that Plaintiff showed the hypomanic symptoms of flight of ideas and possible bipolar condition given that he also was crying and showed sadness. (R. 1364.)

On June 7, 2016, Plaintiff presented to the emergency department with complaints of back pain. (R. 1133.) Plaintiff asserted that his back pain had worsened over the two

previous days, caused by doing some work around the house. (*Id.*) He described a sharp pain starting in the lower lumbar back and radiating into the left foot with movement, but with no weakness. (*Id.*) Plaintiff also claimed that he was in the process of switching pain clinics and had run out of his oxycodone. (*Id.*) His examination showed normal strength and gait, no bony tenderness, but lower back tenderness. (R. 1136.) Plaintiff was given one oxycodone for his pain. (R. 1137-38.) Plaintiff returned later that day to the emergency department and was complaining as to why he was not sent home with any pain medication. (R. 1142.) He was given a shot of Radol and two Percocet for his pain. (R. 1143.)

On August 12, 2016, Dr. Stulc noted that he had previously seen Plaintiff on two occasions, one of which was for a consultation for spinal cord stimulator therapy in March 2016. (R. 1330.) Dr. Stulc did not see him again until July 2016, where he requested pain medicines, as he felt that he needed them and nobody was prescribing them to him. (R. 1330.) Dr. Stulc agreed to write him 10 mg oxycodone three tablets per day prescription, having reviewed the prescriber database, and finding the clinic having been the only prescriber presently for this medication. (*Id.*) It was also noted that Plaintiff had been rude to staff and had missed a number of appointments. (R. 1330.) Plaintiff also was upset that MAPS pain clinic was not going to pursue any medication or further therapies for him. (*Id.*)

On August 26, 2016, Plaintiff underwent an MRI for his lumbar spine. (R. 1159-60.) The results showed: Postprocedural changes at L5-S1 were again demonstrated; enhancement/edema had become more diffuse, extending away from the disc space; mild

grade 1 retrolisthesis of L5 on S1 was again demonstrated; enhancing granulation/fibrous tissue along the anteromedial aspect of the left L5-S1; facet joint was again demonstrated without significant interval change, appearing to surround the transiting left S1 nerve root, similar to the prior study; residual mild right foraminal narrowing and mild/moderate left foraminal narrowing were again noted; mild spinal stenosis and mild bilateral foraminal narrowing at L4-5, possible contact of the disc to the transiting left L5 nerve root without significant impingement; the spinal canal was otherwise patent; and the distal spinal cord signal was unremarkable.  (R. 1160.)

On September 19, 2016, Plaintiff was again seen by Dr. Stulc for his chronic back and left leg pain.  (R. 1324.)  Plaintiff described his pain as severe and life altering.  (*Id.*) He was using a cane.  (*Id.*)  He was on the maximum dose of Neurontin and was taking oxycodone 10 mg, 1 by mouth 3 times a day, without significant apparent behavior or prescribing red flags present.  (*Id.*)  It was noted that Plaintiff had missed several appointments.  (*Id.*)  According to Dr. Stulc, recent MRI imaging for the lumbar spine revealed quite a bit of scar tissue around the left S1 nerve with the possibility of some arachnoiditis at L4 5 level slight, clumping of the nerve roots at the L4 5 level, edema in the L5-S1 vertebral bodies and left L5 neural foraminal narrowing, and 3 level degenerative disc disease L3-4, L4-5, L5-S1.  (R. 1324, 1328.)  The diagnosis for Plaintiff was chronic pain, and lumbar radiculopathy.  (R. 1324-25.)  Plaintiff showed interest in a spinal cord stimulator.  (R. 1324.)

A September 19, 2016 X-ray for the lumbar spine showed advanced L5-S1 degenerative changes and fixed 5 mm L5 retrolisthesis; mild L 1-2 degenerative changes; and was negative for abnormal movement. (R. 1326.)

On October 17, 2016, Dr. Stulc believed that Plaintiff's pain was neuropathic in nature, which had greatly affected his quality of life, and believed Plaintiff was an ideal candidate for a spinal cord stimulator. (R. 1322.) Plaintiff decided to proceed with the stimulator and was provided with a refill of oxycodone. (*Id.*) It was noted that Plaintiff had been brash with coordinating staff, but was very polite after it had been addressed with him. (*Id.*) A pain psychologic assessment was performed, which showed no contraindications to proceeding with the stimulator. (*Id.*)

On November 15, 2016, Plaintiff was seen for his chronic pain and medication management. (R. 1320.) Plaintiff reported that his three pills of 10 mg of oxycodone provided pain relief with no side effects but sought an extra pill a day as the result of a cold with cough that exacerbated his pain, which was denied by his providers. (R. 1320.) He was offered the muscle relaxant Flexeril. (*Id.*)

On November 29, 2016, Plaintiff had a back stimulator implanted, but soon thereafter he hit the stimulator cord in his car door, which resulted in a likely dislodging of wires. (R. 1319, 1161.) On December 1, 2016, Plaintiff decided to proceed with the permanent back stimulator based on significant pain relief he had during his previous eight-hour trial. (R. 1317.)

On February 1, 2017, it was noted that Plaintiff was going to be implanted with a stimulator on February 7, 2017. (R. 1169.) It was also noted that Plaintiff had a history

of major depression and anxiety and was taking Cymbalta and Xanax.  (R. 1169.)
Plaintiff denied mood instability, anhedonia, difficulty sleeping and concentrating;
claimed no change in appetite or change in weight; claimed he had no trouble with
memory; denied being hopeless or helpless; and he denied hallucinations or delusions.
(R. 1170.)  There were no suicidal or homicidal ideations and Plaintiff had been
compliant with recommended medical therapy.  (*Id.*)  The examination of Plaintiff
showed he had a decreased range of motion on his left side due to pain, his neurological
examination was normal, and psychiatric examination showed an appropriate affect.  (R.
1173-74.)

Plaintiff was implanted with a spinal cord neurostimulator on February 7, 2017 to
deal with his leg and back pain.  (R. 1309.)

On February 10, 2017, Plaintiff was transported via ambulance to the emergency
room with back pain and constipation.  (R. 1187.)  Plaintiff appeared annoyed by
questions and wanted something for his pain.  (R. 1190.)  Plaintiff had undergone a
procedure for placement of a spinal cord stimulator three days earlier.  (R. 1193.)  There
were two bandages in place from a recent procedure and when the provider barely
touched one of the bandages Plaintiff screamed in pain, even though there was no
redness, no swelling, no drainage, nor any warmth.  (R. 1191.)  It was noted that Plaintiff
showed normal speech, but had an odd affect and was fidgety.  (R. 1191, 1193.)  The
impression for Plaintiff was mild constipation, a stimulator device that appeared to be in
satisfactory position, and no other acute or significant findings to explain his claimed
pain.  (R. 1193.)  His urine was positive for amphetamines and THC, and doctors opined

that he acted like he was abusing amphetamine.  (R. 1194.)  While he denied taking

Adderall, Plaintiff noted that his son was taking the medication.  (*Id.*)

On January 1 and February 17, 2017, Plaintiff was seen for therapy by Therapist

Sego, who noted that Plaintiff met the criteria of bipolar disorder given his flight of ideas

and crying.  (R. 1365, 1372.)  It was noted that Plaintiff was depressed, distractable,

delusional, and his speech was pressured.  (*Id.*)

On March 24, 2017, Plaintiff was having hardware issues with his stimulator but

reported some good relief with his pain.  (R. 1306.)  Plaintiff did not feel he could

decrease his oxycodone.  (*Id.*)

On April 26, 2017, Plaintiff presented for a follow-up for his spinal cord

stimulator implant.  (R. 1304.)  He noted that he had "great control" of his chronic left leg

pain.  (*Id.*)  Plaintiff had begun to perform more aggressive activities, and had "been

having some difficulty assimilating back into doing yard work or having aggressive sex."

(*Id.*)  It was also noted that Plaintiff needed to make a concerted effort to get off his

opioid medications.  (*Id.*)

On June 8, 2017, Plaintiff again attempted to obtain oxycodone pills for his pain,

and when he was told he would not be provided any as part of his medical appointment,

he stated he was going to cancel his appointment and hung up on the medial assistant.

(R. 1146-47.)

On June 20, 2018, Therapist Sego reported that Plaintiff was irritable, worried,

distractable, compulsive, physically he was within normal limits, his speech was within

normal limits, and he was fidgety.  (R. 1391.)  On July 24 and 26, 2018, it was noted by

Therapist Sego that Plaintiff was upset, distractable, compulsive, he had pain, his speech was within normal limits, and he was fidgety. (R. 1392-93.)

At his July 27, 2017 chronic pain management appointment, it was noted that Plaintiff had been late to the appointment, which had resulted in him missing the Medtronic representative for reprogramming of his neurostimulator device. (R. 1299.) It was also noted that he had been late for a number of appointments. (*Id.*) While the devices provided improvement of symptoms, he still believed he needed oxycodone for his pain. (*Id.*) Plaintiff denied any significant side effects from the medication. (*Id.*)

On August 20, 2017, Plaintiff was seen for his back and leg pain. (R. 1149.) He also complained of bilateral leg swelling, which he claimed was related to standing for more than few minutes at a time. (*Id.*) In addition, he reported that pain radiated into his lower left leg, which was electric-like, and that his pain was not alleviated by taking oxycodone. (*Id.*) Plaintiff's examination showed that he was alert and oriented, sensation was normal to light touch, strength was normal, his gait was normal and steady, he had a normal range of motion, and no midline tenderness to palpation. (R. 1151.) During the appointment, Plaintiff began raising his voice and using profanity towards his minor son and threatened another patient who claimed he had heard the exchange. (R. 1151-52, 1154.) The police were called. (R. 1152.) The son had been climbing on a wheelchair. (*Id.*) Medical providers asked him not to use profanity, and Plaintiff stood up and walked out of the emergency department without any obvious or significant distress even though he initially presented to the emergency department ambulatory to a wheelchair. (R. 1152.)

Plaintiff's mental therapy session on September 11, 2017 with Therapist Sego showed that Plaintiff was cooperative with an expansive affect and depressed mood, but with no delusions, an intact memory, an intact judgment, and moderate limitations to concentration and social interactions. (R. 1354-1359.)

On September 13, 2017, Therapist Sego noted that Plaintiff was depressed, worried, distractable, impulsive, and fidgety. (R. 1374.) His speech was within normal limits, and he was oriented. (*Id.*)

During a September 21, 2017, therapy session, Plaintiff reported that he wanted to know why he was so angry. (R. 1375.) On October 5, 2017, and November 16, 2017, Plaintiff reported trust issues with a significant other. (R. 1376-77.)

On November 30, 2017, Plaintiff claimed he was highly stressed because his significant other had filed a domestic violence report. (R. 1379.) It was noted that Plaintiff was extremely angry, he was worried, districted, compulsive, his speech was normal, he was fidgety, and posed no harm to others. (R. 1379.)

On December 27, 2017, Plaintiff saw Dr. Stulc regarding chronic back and left leg pain. (R. 1295.) Plaintiff was told that it had been difficult to care for him as he needed to be on time for his appointments. (R. 1295.) He was also told that his narcotic pain medication would not be increased and that he would be better served by pain clinic given his psychosocial history, however, Plaintiff refused. (*Id.*) While relief from the neurostimulator was not perfect nor giving him significant functional improvement, he had been seen on the same day by a neurostimulator representative in order make further

17

attempts at controlling his pain with the device. (*Id.*)  It had been previously noted by a nurse practitioner that Plaintiff had become very rude and disrespectful.  (R. 1295, 1297.)

On November 17, 2017, Dr. Stulc filled out a "Report of Work Ability—Return to Work" form for Plaintiff.  (R. 1086.)  In this form, Dr. Stulc checked the box that stated Plaintiff was able to work with restrictions.  (*Id.*)  Dr. Stulc could choose from the following categories: sedentary, very light, light, moderate, heavier, and fully duty.  (*Id.*)  Dr. Stulc circled the very light category, which contained the following preset limitations:

> Sitting—Standing chair but stretching and positional changes as needed.
>
> Standing and walking—Stretching or resting every 30 minutes.
>
> Carrying and level lifting—10 lbs. occasionally (1-33% of the day's shift)
>
> Bending and lifting—None
>
> Pushing and pulling—10 lbs, at height between waist and chest and without bending forward or 25 lbs. on wheels.

(*Id.*)

On November 6, 2017, Dr. Stulc also filled out a checklist form where he represented that Plaintiff could work 0-19 hours per week.  (R. 1088.)

On November 17, 2017, Plaintiff saw Dr. Stulc again for his back and leg pain. (R. 1292.)  Plaintiff reported that his back pain had improved approximately 20% and felt as though his left leg had improved approximately 30% with the stimulator. (*Id.*)  He was also on gabapentin for left leg numbness and felt that the gabapentin was helpful for the numbness.  (*Id.*)

On November 30, 2017, Plaintiff's therapist Sego filled out a "Mental Health Report/Employee Work Status" form for Plaintiff.  (R. 1090.)  When asked to opine as to

how many hours per week Plaintiff could work, Therapist Sego checked the box with "0 hours." (*Id.*) While Therapist Sego noted that Plaintiff's diagnosis was bipolar II with paranoid and delusional features, he noted that Plaintiff was not in any treatment and that treatment was not recommended. (*Id.*)

On December 6, 2017, Plaintiff underwent a psychiatric evaluation by psychiatrist Roger Handrich, MD. (R. 1533.) Plaintiff's chief complaint was depression, major. (*Id.*) Plaintiff's medications at the time included oxycodone, Neurontin 3600 mg a day, Flexeril, and ibuprofen. (*Id.*) Plaintiff's mood disorder questionnaire strongly supported a bipolar diagnosis. (*Id.*) Plaintiff claimed that he had been hospitalized at Abbott Northwestern over the previous year for a verbal fight with his father. (*Id.*) Plaintiff represented that he lived with his ten-year-old son, had his 14-year-old daughter half the time, and that the rest of the time he liked repairing cars and car storage. (R. 1534.) He also belonged to a community outreach group and the Catholic church. (*Id.*) He had a girlfriend and could count on his family for emotional support. (*Id.*) His mental status examination showed that he was alert, had good hygiene, he showed psychomotor acceleration, his affect was labile with crying, his mood was sad and anxious, he claimed auditory hallucinations, he had a flight of ideas, his thought content was appropriately abstract and paranoid, his speech was pressured, he had an above average intelligence, his concentration was impaired, his memory was normal, and he had fair insight and judgment. (R. 1534-35.) As to findings based on the Table of Risk, Dr. Handrich found that Plaintiff's risk was "high" based on "one or more chronic illnesses with severe exacerbation/acute or chronic illnesses/drug therapy requiring extensive monitoring for

toxicity." (R. 1535.)  The diagnosis for Plaintiff was bipolar I disorder. (*Id.*)  Plaintiff was prescribed with Latuda and Depakote. (*Id.*)

On December 9, 2017, Plaintiff presented to the emergency room complaining of back pain and that the neurostimulator in his back had been acting up and increasing in amplitude, and that he and his son could not find anyone at Medtronic to help and were unsure who to call. (R. 1209.)  The physical examination showed that Plaintiff was 6'1", 264 pounds, and the medical provider characterized him as obese. (R. 1212.)  He did not appear in any distress. (*Id.*)  His affect and speech were normal. (R. 1213.)  Plaintiff was tender over the stimulator and showed diffuse lumbar paraspinous musculature tenderness to light palpitation. (*Id.*)  Plaintiff was given an injection of Zyprexa, to which he responded. (R. 1213.)  Plaintiff planned to turn down the stimulator and call Medtronic. (*Id.*)

On December 18, 2017, Plaintiff was angry because he claimed that a medical receptionist was making fun of him. (R. 1381.)  Plaintiff was assessed as angry, fearful, and agitated. (*Id.*)  His thoughts, behavior, and speech were within normal limits. (*Id.*)

On December 21, 2017, Plaintiff saw Dr. Handrich for a mental health follow-up. (R. 1536.)  Plaintiff reported no change with the use of medications. (*Id.*)  Plaintiff spent most of the visit complaining about a comment he overheard, claiming that one of the support staff complained about how he had acted when he came into the building last week as a result of him being late due to overscheduling, which was offensive to him. (*Id.*)  Plaintiff wanted to file a complaint with Blue Cross Blue Shield, and  Dr. Handrich brought the office manager into this visit to help deescalate the situation by offering him

information on how to file a complaint.  (*Id.*)  Plaintiff's medications were increased.  (R. 1537.)

On January 25, 2018, Plaintiff saw Dr. Stulc for his back and leg pain. (R. 1291.) Plaintiff reported a 30% improvement with the neurostimulator.  (*Id.*)  The representative for the neurostimulator company was able to address some of his issues regarding programming at the appointment.  (*Id.*)  On the same day Plaintiff saw Therapist Sego and was distraught and angry about his girlfriend.  (R. 1382.)  Plaintiff was crying.  (R. 1382.)  Plaintiff's speech was normal, he was fidgety, and there was nothing noted that he posed any harm to himself or others.  (R. 1382.)  His homework involved focusing on managing his anger.  (*Id.*)

On January 30, 2018, Plaintiff reported being distraught about his girlfriend's mixed messages, was agitated, distracted, compulsive/impulsive, and fidgety.  (R. 1383.) No threat of harm to others was noted.  (*Id.*)

On February 4, 2018, Therapist Sego provided a mental health statement regarding Plaintiff.  (R. 1345.)  Therapist Sego diagnosed Plaintiff with bipolar II with paranoid and delusional features.  (*Id.*)  Therapist Sego noted a personality change, mood disturbance, emotional lability, anhedonia, paranoia, difficulty with thinking or concentration, manic syndrome, suicidal ideations, obsessions, compulsion, pathological dependency, and irritability.  (*Id.*)  The clinical support for these findings was that he was hospitalized for a manic episode and that he had a depressed mood.  (*Id.*) Therapist Sego believed that Plaintiff would be off task 25% or more during a typical workday, and that he would miss four or more days a month as the result of his impairments or treatment.  (R. 1346.)

Therapist Sego found that Plaintiff had marked limitations as to being able to understand and carry out simple instructions, maintain attention for extended periods of time, deal with stress of semi-skilled and skilled work, work in coordination and proximity to others without distraction, and make simple decisions. (R. 1347.) Therapist Sego also found Plaintiff to have an extreme limitation with respect to responding appropriately to changes in the workplace. (R. 1347.) In addition, Therapist Sego opined that Plaintiff had marked limitations with respect to his activities of daily living and his ability to interact with others. (*Id.*) He also had frequent deficiencies with concentration, persistence, and pace. (*Id.*) Therapist Sego claimed that Plaintiff had repeated episodes of deterioration or decomposition based on his no-shows to appointments due to pain flare-ups. (R. 1348.)

On February 28, 2018, Plaintiff was seen again for therapy and reported concerns regarding his son. (R. 1384.) Plaintiff was fidgety and worried about the baby that was coming. (*Id.*)

On March 23, 2018, Plaintiff reported to Dr. Stulc that things were "going relatively well for him with no new medical problems. . . ." (R. 1290.) On March 27, 2018, Plaintiff reported to Therapist Sego that his depressive feelings were impeded by his son's interactions, and he loved and encouraged his son. (R. 1385.) His mood was depressed, distractable, compulsive, and fidgety. (*Id.*)

On April 8, 2018, Plaintiff was seen for a request for a medical marijuana referral. (R. 1217.) Plaintiff asserted that his pain was stable with his spinal cord stimulator, but that he had flare-ups with uncontrollable pain. (*Id.*) Plaintiff's examination showed that

he was not in any acute distress and that he was appropriate with a normal affect and normal speech. (R. 1221.)

On April 15, 2018, Plaintiff presented to the emergency department, with his 11-year-old son, complaining of right buttock pain from falling while removing snow with a snowblower. (R. 1226.) Plaintiff admitted that he was out of his oxycodone and his next refill was in one week. (*Id.*) Plaintiff's examination showed that he was obese, he was not in any discomfort or any acute distress, Plaintiff was tender over his right buttock, he showed a normal affect and speech, and had a grossly normal neurological examination. (R. 1229.) The pelvis and right hip examination and imaging were unremarkable. (R. 1229-30.) They were unable to refill his chronic pain medication, but he did choose to take a Zyprexa injection for his pain, which provided him improvement. (R. 1230.)

On April 20, 2018, it was reported that Plaintiff was perturbed in therapy. (R. 1387.) He felt sorry for his baby and girlfriend, but was setting boundaries. (R. 1387.) Plaintiff was sad, and agitated by the mother's distance to her baby, he was distractible, compulsive, and fidgety. (*Id.*) His speech was within normal limits, he was oriented, and denied wanting to harm himself or others. (*Id.*)

On May 12, 2018, Plaintiff was seen for an exacerbation of his chronic back pain. (R. 1235.) Plaintiff admitted he was out of his oxycodone medication and could not refill it for another six days. (*Id.*) It was also noted that he had been out of his oxycodone early at his previous appointment. (*Id.*) Plaintiff also admitted that he had overdone it over the last two days. (*Id.*) He had mowed three lawns and put in a tile floor, amongst several other things. (*Id.*) Plaintiff also noted that he was applying for disability. (*Id.*)

The provider noted that Plaintiff was obese.  (R. 1238.)  Plaintiff was not in any acute distress, and he was able move from his left side to his right side easily while lying down.  (*Id.*)  Plaintiff had mild diffuse lower lumbar tenderness, but no midline tenderness.  (R. 1239.)  There were no neurological symptoms or weakness.  (*Id.*)  His examination was unremarkable.  (*Id.*)  He also had a normal affect and normal speech.  (R. 1239.)  He was treated with Toradol and Zyprexa IM, which provided him with good relief.  (R. 1240.)  Plaintiff was also provided a prednisone burst for 5 days and a Lidoderm patch.  (*Id.*)

On May 16, 2018, Plaintiff reported feeling overwhelmed with a baby on the way and how it was impacting his son.  (R. 1389.)

On May 31, 2018, Plaintiff was seen for acute right sided lower back pain.  (R. 1288.)  Lower extremity strength was normal.  (*Id.*)  Plaintiff had pain with palpation of his back.  (*Id.*)

On June 13, 2018, Plaintiff underwent an MRI that was largely unchanged from the scan from 2016, showing a slight progression of disc desiccation at L3-4, L4, but showing no new large disc herniations.  (R. 1247, 1283.)

On June 25, 2018, Plaintiff presented to the emergency room after falling from his bike after he had been drinking at a bar.  (R. 1257.)  Imaging was negative and he was able to get up and walk around and ambulated steady.  (R. 1261.)

On August 22, 2018, Therapist Sego reported that Plaintiff was stressed, irritable, fearful, distractable, impulsive, and fidgety, his physical health and speech were within normal limits, and he posed no harm to himself or others.  (R. 1394.)

On September 24, 2018, Plaintiff was seen for his chronic pain. (R. 1282.) Plaintiff claimed that the implanted neurostimulator provided him with mild to moderate pain relief. (*Id.*) He was maintained on opioid treatment. (*Id.*) Plaintiff claimed he was going to file for disability benefits based on his mental health issues. (*Id.*) Dr. Stulc characterized Plaintiff's chronic pain condition as stable. (*Id.*)

On December 3, 2018, Therapist Sego filled out a form related to obtaining public assistance, in which he diagnosed Plaintiff with bipolar II disorder and PTSD lasting more than 45 days. (R. 1396.) He also opined that Plaintiff would be unable to work in the foreseeable future. (*Id.*)

On December 17, 2018, Plaintiff was seen by Dr. Stulc for a follow-up related to his back and leg pain. (R. 1281.) It was noted that his spinal cord stimulator helped him substantially with his pain, but he was still on chronic opioid therapy at stable levels. (*Id.*) He was undergoing some social stressors and had a small infant at home, which exacerbated some of his chronic pain symptoms. (R. 1281.)

On March 18, 2019, Plaintiff underwent a lumbar MRI that showed: Normal alignment; a mild disc degeneration posterior disc herniation at L4-5; a tiny central annular fissure, otherwise, no spinal canal or neural foraminal narrowing; at L5-Sl, disc degeneration with diffuse disc bulge, postoperative changes, and no narrowing of the spinal canal; a small focal ovoid area of heterogeneous low T2 signal intensity within the left lateral epidural space, unchanged from 2016; possible impingement of the traversing left S1 nerve root; mild right and mild-to-moderate left neural foraminal narrowing; and no spinal canal or neural foraminal narrowing at the remaining levels. (R. 1432.)

Plaintiff's January 16, 2019 exam showed that he was not in any acute distress, he could move his extremities, he had a decreased range of lumbar motion, had trouble lying down and getting up from the examination table, he had a normal gross motor function and tone coordination, and he showed an appropriate affect. (R. 1475.) It was noted that Plaintiff's weight was above normal, but there was no mention of obesity. (*Id.*) Plaintiff was unwilling to act on his weight. (R. 1475.) The assessment plan for Plaintiff's back and leg pain was for Plaintiff to take ibuprofen, a lidocaine patch, and gabapentin. (*Id.*) It was noted that Plaintiff's pain was improved with the placement of the neurostimulator. (R. 1476.) The plan for dealing with anxiety was to follow with counseling. (*Id.*)

On January 8, 2019, it was reported that Plaintiff was dealing with anxiety stemming from his children, especially given that he was taking care of his baby daughter and his son. (R. 1518.) On January 9 and 17, 2019, Plaintiff participated in therapy with his son to address his son's jealousy of Plaintiff spending time caring for his baby daughter. (R. 1516-17.) On January 22, 2019, Therapist Sego noted that Plaintiff's mood appeared stable. (R. 1515.)

On February 6, 2019, Plaintiff was tearful, but stable during his therapy session with Therapist Sego. (R. 1514.) He was processing his pain and dealing with his girlfriend, who told him she was pregnant again. (*Id.*) Plaintiff asserted that adoption may by the best solution, as he needed to focus on raising his son. (*Id.*)

On March 11, 2019, Plaintiff was seen for back pain and for an oxycodone refill. (R. 1525.) Plaintiff's examination showed a normal affect, he was in no apparent distress, he had a normal gait, normal sensation, normal strength in the extremities except

for hip flexors, and tenderness upon palpation in the lumbar region. (R. 1525-26.) The lumbar MRI appeared largely unchanged from 2016. (R. 1526.) Plaintiff wanted to increase the number of oxycodone pills he was given per month. (*Id.*)

On April 3, 2019, Plaintiff appeared at therapy with his son to address the difficulties between the two, and to help the two avoid arguments. (R. 1511.)

On April 9, 2019, Plaintiff appeared at his therapy session crying because he felt abandoned when his girlfriend convinced him not to show up to fight for the custody of his new daughter. (R. 1510.)

On April 16, 2019, Plaintiff addressed his paranoia that his pregnant girlfriend was doing meth, and Therapist Sego noted that his mood was slightly more stable. (R. 1509.) They worked on his tendency to reject his girlfriend due to fear of abandonment. (*Id.*)

On May 9, 2019, Plaintiff reported that he was now engaged to his girlfriend, they had one daughter together, and he had custody of his minor son. (R. 1426.) He showed a normal gait, and he had a normal affect with normal speech. (R. 1427.)

On June 17, 2019, Plaintiff was seen in part for his chronic low back pain and a medication review. (R. 1523.) Plaintiff continued to have chronic low back and leg pain that was improved with the medications and his spinal cord stimulator but not absent, as he continued to endorse right low back pain. (*Id.*) Dr. Stulc noted that Plaintiff did not feel like he could come off his opioids, and Dr. Stulc told him if he wanted other medications, he would have to go through a pain clinic. (*Id.*) A new lumbar MRI showed no significant changes from 2016. (*Id.*)

On July 2, 18, and 24, 2019, Plaintiff reported that he was dealing with his teenage son's mental health issues and working with parenting challenges and boundaries with his girlfriend, and was stressed about what to do with both relationships.  (R. 1501-03.)

On August 2, 2019, Plaintiff again participated in a therapy session with Therapist Sego.  (R. 1568.)  Plaintiff was processing challenges with anxiety and emotional regulation problems, especially as it related to his concern about his daughter not getting cared for by his girlfriend.  (*Id.*)  It was noted that his girlfriend had left his daughter on the bed and while she left the room, his daughter fell off the bed.  (*Id.*)  He also reported that his girlfriend had given his daughter a hand mirror, which she broke, and when he woke up, he saw her putting a glass shard in her mouth. (*Id.*)  Plaintiff was worried about his daughter being neglected because he had "relinquished parental rights [and] he did not feel like he could care for her."  (*Id.*)  Therapist Sego told Plaintiff that he would have to make a report if there was neglect or abuse.  (*Id.*)  Plaintiff reported that he had not seen any abuse.  (*Id.*)  As part of his therapy, they discussed his dependency on women and how his bipolar disorder damaged those relationships.  (*Id.*)

On August 15, 2019, Plaintiff saw Therapist Sego, and was frustrated because his girlfriend was neglecting their daughter, leaving her in the crib, and because his daughter was 35 pounds over his 10-pound weight restriction.  (R. 1569.)  Plaintiff again described the incident where his girlfriend gave his daughter a hand mirror and "she was chewing on glass when he woke up."  (*Id.*)

On August 20, 2019, Plaintiff reported that his back and leg symptoms worsened in March of 2019 after shoveling wet, heavy snow.  (R. 1563.)  The symptoms came on

rather suddenly. (*Id.*) An MRI of the lumbar spine was completed at that time, which essentially showed a stable appearance of degenerative changes noted in his lumbar spine. (*Id.*) There were no acute findings. (*Id.*) Plaintiff claimed persistent back and left leg pain, and that he had experienced increasing pain in his right lower extremity for the past year. (*Id.*) His symptoms in the right leg were similar to that of the left leg. (*Id.*) The pain radiated down the back of the leg in a posterior fashion with numbness and tingling into the heel and lateral toes of both feet. (*Id.*) At times, the pain in his legs was sharp and electric-like, at other times it was a dull aching pain. (*Id.*) He claimed that the pain was not the same type of symptoms produced by his stimulator, and that it felt like nerve pain. (*Id.*) It was noted that MRI findings from March showed a stable appearance of the degenerative changes of his lumbar spine. (R. 1566.)

On September 4, 2019, Plaintiff went in for treatment for a headache, dizziness, and chest pain. (R. 1543.) The treatment note suggests that he was not on mental health medications and that his past medication (Latuda) provided him with no relief. (*Id.*) It was noted that he became argumentative during the conversation, he was redirectable for some time, and then became agitated again. (R. 1543, 1547.) Plaintiff had difficulty getting up from a lying position due to back pain, but he showed a normal gait. (*Id.*)

On September 13, 2019, Therapist Sego saw Plaintiff for therapy, and noted that he was not being medicated for bipolar disorder. (R. 1571.) Plaintiff was tearful regarding his pain. (*Id.*)

On September 25, 2019, Plaintiff processed his challenges with bipolar depression and anxious distress around feeling elated about the birth of his son and paranoia in that he did not believe he was the father. (R. 1572.)

On October 2, 2019, Plaintiff participated in therapy in order to process his bipolar disorder. (R. 1573.) It was noted he had been off prescriptions since his psychiatrist had retired. (*Id.*) Plaintiff was experiencing hypomanic symptoms, such as racing thoughts, big emotional swings, and difficulty with controlling anger, especially being triggered out of frustration of his girlfriend's neglect of their daughter. (*Id.*) Plaintiff felt frustration at his disabilities and inability to work. (*Id.*)

On October 3, 2019, Plaintiff was tearful during therapy and experiencing stress based on his girlfriend continuing to neglect his daughter. (R. 1574.) He wanted a child protection services report filed. (*Id.*) Plaintiff felt bad that he could not take care of his 15-month-old daughter and the new baby. (*Id.*)

## III. <u>LEGAL STANDARD</u>

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law. *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018). As recently defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of

"substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (marks and citation omitted). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

## IV.   DISCUSSION

Plaintiff sets forth four categories of arguments in support of the Motion: (1) the ALJ failed to properly analyze the opinions of treating physician Dr. Stulc's November 17, 2017 opinion, examining psychiatrist Dr. Handrich's opinion, and Therapist Sego's opinion; (2) the ALJ "played doctor" by incorrectly interpreting the medical evidence and erred by not obtaining a new medical opinion after Plaintiff began psychiatric treatment in 2017 for major depression, especially in light of the fact that the RFC allows occasional contact with coworkers and supervisors; (3) the ALJ erred in evaluating Plaintiff's subjective symptoms, as the decision addressed no evidence outside of the

objective medical evidence and improperly relied on daily activities; and (4) challenges the VE's testimony, and the ALJ's reliance on that testimony.

The Court addresses each argument in turn.

**A.    The Weight Assigned to the Medical Opinions**

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

In evaluating a claimant's work-related limitations, the ALJ must evaluate every

medical opinion received from acceptable medical sources.  *See* 20 C.F.R § 404.1527(c).

"Medical opinions are statements from acceptable medical sources that reflect judgments

about the nature and severity of your impairment(s), including your symptoms, diagnosis

and prognosis, what you can still do despite impairment(s), and your physical or mental

restrictions."  20 C.F.R. § 404.1527(a)(1).

Ultimately, it is the ALJ's function to resolve conflicts among medical opinions.

*See Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 667 (8th Cir. 2003) (citing *Bentley v.*

*Shalala*, 52 F.3d 784, 785 (8th Cir. 1995); *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th

Cir. 2000)) (citation omitted).  Indeed, "[i]t is the function of the ALJ to weigh

conflicting evidence.  We will not reverse merely because evidence also points to an

alternate outcome."  *Dols v. Saul*, 931 F.3d 741, 749 (8th Cir. 2019) (quotation marks and

citations omitted).

### 1.    Weight Given to the Opinion of Dr. Stulc

Generally, the ALJ gives more weight to medical opinions from treating sources,

"since these sources are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a

unique perspective to the medical evidence that cannot be obtained from the objective

medical findings alone or from reports of individual examinations, such as consultative

examinations or brief hospitalizations."  20 C.F.R § 404.1527(c)(2).[4]

"A treating physician's opinion is generally given controlling weight, but is not

---

[4]    The Court notes that § 404.1527 applies to claims filed before March 27, 2017,
which would include the present case.

inherently entitled to it. An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight. For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'" *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 495 F.3d at 937 (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted).

Plaintiff argued that the ALJ improperly discounted Dr. Stulc's November 17, 2017 opinion on the basis that it is a checkbox form, given that the restrictions provided were quite detailed, he handwrote on the form that the restrictions would be "indefinite," and included a medical basis for the restriction; and the ALJ ignored Dr. Stulc's treatment notes showing that he was difficult to deal with due to social impairments and attendance problems (such as remembering appointments and interacting with others), needed oxycodone for pain management and had undergone spinal cord stimulator

operation for his back and leg pain, which had afforded him with little relief.  (Dkt. 28 at 8-9; Dkt. 33 at 3-6.)  Defendant counters that the ALJ was correct in affording Dr. Stulc's opinion in the checkbox form little weight since it cites to no medical information and offer no elaboration, especially in light of Plaintiff's daily activities; that contrary to Plaintiff's assertion, the ALJ considered Dr. Stulc's treatment notes; and that Plaintiff improperly conjured up limitations regarding his mental functional capacity that Dr. Stulc did not endorse.  (Dkt. 32 at 5-9.)

>   With respect to the November 2017 opinion, the ALJ found as follows:
>
>   There is a "very light" check block opinion from Dr. Stulc at B19F (this is duplicated at B21F/14). Another check box opinion is found at Exhibit 25F. Dr. Stulc wrote in November 2017 claimant was able to work with restrictions indefinitely. (Ex. 21F/14). I give these opinions little weight because they are just conclusory check block opinions and unexplained and because claimant's activities such as riding his bike, clearing snow, mowing lawns, and laying tile, caring for an infant, traveling are all well in excess of that opinion. Further, when seen by providers, claimant has normal gait, intact neurological function and strength. (Ex. B14F 8, B20F 83, 84, 43, 61, 123, 21F/21).

(R. 27.)

As Plaintiff concedes, the Eighth Circuit has concluded that "a conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little to no elaboration."  *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (citation and marks omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("The opinion consists of three checklist forms, cites no medical evidence, and provides little to no elaboration.  'The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value.'") (quoting *Holmstrom v.*

*Massanari*, 270 F.3d 715, 721 (8th Cir. 2001)).  As set forth previously, in the form at

issue, Dr. Stulc checked the box that stated Plaintiff was able to work with restrictions.

(*Id.*)  Dr. Stulc could choose from the following categories: sedentary, very light, light,

moderate, heavier, and fully duty.  (*Id.*)  Dr. Stulc circled the very light category, as

opposed to sedentary, which contained the following **preset** limitations:

> Sitting—Standing chair but stretching and positional changes as needed.
>
> Standing and walking—Stretching or resting every 30 minutes.
>
> Carrying and level lifting—10 lbs. occasionally (1-33% of the day's shift)
>
> Bending and lifting—None
>
> Pushing and pulling—10 lbs, at height between waist and chest and without
>
> bending forward or 25 lbs. on wheels.

(R. 1086.)

The Court agrees with Defendant that this is the type of checklist form that

provides no medical support for the restrictions and provides for no elaboration.  While

Plaintiff claims that Dr. Stulc wrote in the form that he attributed these restriction "to

chronic radicular lumbar pain" (Dkt. 28 at 8-9), this reference does not pertain to the

November 17, 2017 opinion, but rather a different November 6, 2017 form that lists his

diagnosis (R. 1088.  For all of these reasons, the Court finds no error in the weight

afforded the November 17, 2017 opinion.  Moreover, the ALJ did not improperly

discount Dr. Stulc's opinion on the basis of Plaintiff's activities.  *See Thomas v.*

*Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) ("Thomas's self-reported activities of daily

living provided additional reasons for the ALJ to discredit Dr. Hollis's pessimistic views

of her abilities.").  Indeed, the record supports this position, as Plaintiff was repairing

vehicles, engaging in household repairs, performing household cleaning and laundry,

caring for his children, mowing lawns, bicycling, and putting in a tile floor.  (*See, e.g.*, R.

578, 1257, 1235, 1514, 1516-17, 1534.)

The Court also rejects Plaintiff's argument that the ALJ did not consider Dr.

Stulc's treatment notes.  The ALJ considered Dr. Stulc's treatment notes as evidenced by

his references to B14F and B21F, which contain in large part the records pertaining to his

treatment of Plaintiff.  (R. 19-21.)  "[A]n ALJ's failure to cite specific evidence does not

indicate that such evidence was not considered."  *Wildman v. Astrue*, 596 F.3d 959, 966

(8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject

physician's opinion when ALJ made specific references to other findings set forth in

physician's notes).  Indeed, while the ALJ did not find Plaintiff disabled and afforded Dr.

Stulc's opinion lesser weight, Plaintiff ignores the fact that the ALJ assigned Plaintiff a

"sedentary" RFC,[5] as opposed to the more demanding "very light" RFC assigned by Dr.

Stulc.

Finally, while it is true that Dr. Stulc refenced Plaintiff's behavior at times in his

notes, he made no assessment regarding Plaintiff's mental functioning, or for that matter

---

[5]    Under the regulations "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

provided any mental health diagnosis for Plaintiff, even assuming he was qualified to do so.

### 2.    Dr. Handrich

Plaintiff argues that the ALJ also erred by failing to give the psychiatrist Dr. Handrich's opinion that Plaintiff was "high risk" any weight as well as failing to note that Dr. Handrich needed help from his assistant to "deescalate" Plaintiff.  (Dkt. 28 at 10.) The Court assumes that Plaintiff is referring to the following in Dr. Handrich's December 21, 2017 progress note: "**Table of Risk:** High (one or more chronic illnesses with severe exacerbation/acute or chronic illnesses/drug therapy requiring extensive monitoring for toxicity)."  (R. 1537.)  The presenting problems for a high level of risk include:

> One or more chronic illnesses with severe exacerbation, progression, or side effects of treatment

> Acute or chronic illnesses or injuries that pose a threat to life or bodily function (e.g., multiple trauma, acute MI, pulmonary embolus, severe respiratory distress, progressive severe rheumatoid arthritis, psychiatric illness with potential threat to self or others, peritonitis, acute renal failure) An abrupt change in neurologic status (e.g., seizure, TIA, weakness, sensory loss)

https://www.timeofcare.com/mdm-table-of-risk/ (last accessed January 19, 2022).

As best as this Court can discern, the "high" rating on the "Table of Risk" means that Plaintiff has a chronic illness, but that does not speak specifically to Plaintiff's mental functioning limitations.  In order to prove disability, Plaintiff must establish limitations, not just diagnoses.  *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990).

Moreover, Plaintiff asserts that the ALJ failed to note that Dr. Handrich needed

help from his assistant to "deescalate" Plaintiff, that Plaintiff was observed to frequently break down crying, use rapid speech, pressured speech, impaired concentration, flight of ideas, sadness, anxiousness admitted to hearing voices, and was diagnosed with bipolar disorder with psychotic features. (Dkt. 28 at 11-12.) The Court finds, similar to Dr. Stulc, the ALJ did consider Dr. Handrich's notes. (R. 14, 25.) Indeed, the ALJ referenced many of Dr. Handrich's observations:

> Roger Handrich, MD, Central Minnesota Mental Health Center, conducted a psychiatric evaluation in December 2017 for major depression. (Ex. B31F/1-5). Claimant told Dr. Handrich that he lived in Buffalo with his ten-year-old son. He has his fourteen-year-old daughter half the time. The rest of the time, he likes car repair and storage. Claimant belonged to a community outreach group and the Catholic Church. Claimant had a girlfriend. Claimant felt he could count on his mother, father, sister and brother in law for support. (Ex. B31F/2). Claimant denied any drug use. Claimant was very emotionally labile. Claimant appeared clean and speech was rapid and pressured. Claimant admitted he hears voices at time and that he is bothered by "magical thinking." Claimant thought he had ESP. Claimant remembers three of three objects immediately and two of three after five minutes. He made only one error in five attempts at serial sevens. He could recall eight digits forward and four in reverse. (Ex. B31F/2). Dr. Handrich diagnosed a bipolar disorder, with mixed symptoms and psychotic features. (Ex. B31F/2). Dr. Handrich prescribed Latuda 20 milligrams and Depakote ER 1000 milligrams. (Ex. B31F/3). At the next visit, he said this was not helpful. (Ex. B31F/4). The doctor increased the Latuda to 40 milligrams and added Seroquel 100 milligrams at night. (Ex. B31F/5).

(R. 25.) Plaintiff has simply failed to set forth how the RFC was not based on substantial evidence in the record as whole, and the Court will not divine an argument on his behalf. The best this Court can discern as to Plaintiff's argument is that because he needed to be deescalated, the RFC's provision with respect to his ability to interact with others is not supported by substantial evidence in the record. The relevant portion of Dr. Handrich's notes provides as follows:

> The patient spends most of the visit complaining about a comment he overheard on the lower level coming from upstairs in this facility. He claims that one of the support staff complained about how he had acted when he came into the building last week as a result of my being late due to overscheduling. The comment was offensive to him. He wants to file a complaint with Blue Cross Blue Shield. I brought the office manager into this visit to help deescalate the patient. She was helpful in offering him information on how to file a complaint.

(R. 1536.)

While Plaintiff was complaining regarding his treatment, there is no indication that he was violent or incapable of having social contact with others. If anything, it shows his ability to appropriately resolve a conflict. More importantly, there is no opinion by Dr. Handrich or Therapist Sego that he is incapable of having any contact with others. This is simply not borne by the substantial evidence in the record as a whole.

### 3.    Therapist Sego

The Social Security Regulations distinguish "acceptable medical sources" from "other medical sources[,]" including nurse practitioners, physicians assistants, licensed clinical social workers, and therapists. *See* Social Security Regulation ("SSR") 06-03p, 2006 WL 2329939, at *1-2 (Aug. 9, 2006).[6] Although evidence provided by "other" medical sources "cannot establish the existence of a medically determinable impairment," once a medically determinable impairment is found, information from "other sources" may "provide insight into the severity of the impairment(s) and how it affects the

---

[6]    SSR 06-03p was rescinded on March 27, 2017. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15,263, 15, 263 (Mar. 27, 2017). The rescission was "effective for claims filed on or after March 27, 2017." *Id*. As stated above, Plaintiff filed for benefits in 2016.

individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2; *see also Sloan v. Astrue*, 499 F.3d 883, 888-89 (8th Cir. 2007). The ALJ may consider how frequently the source has seen the individual, how consistent the opinion is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairments. SSR 06-03p, 2006 WL 2329939, at *3.

Opinions from "other sources" and examining acceptable medical sources are still to be evaluated under the criteria provided in 20 C.F.R. § 404.1527(c), including, the length and frequency of treatment, the nature and extent of the treatment relationship, consistency of the opinion (including to the record as a whole), the supportability of the opinion, and the specialization of the provider. 20 C.F.R. § 404.1527(c), [7] (f); *see also* SSR 06-03P, 2006 WL 2329939, at *4-5. Further, "[t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular

---

[7]    The Court also finds no error as it relates to the ALJ's consideration of the factors under § 404.1527(c) or 20 C.F.R. § 416.927, as asserted by Plaintiff. (Dkt. 28 at 11) First, "the regulations do not strictly require the ALJ to explicitly discuss each factor under 20 C.F.R. § 404.1527(c)." *Mapson v. Colvin*, No. 14-cv-1257 (SRN/BRT), 2015 WL 5313498, at *4 (D. Minn. Sept. 11, 2015) (cleaned up) (citing *Roesler v. Colvin*, No. 12-cv-1982 (JRT/JJK), 2013 WL 4519388, at *5, n.5 (D. Minn. Aug. 26, 2013)); *see also Jarrett o/b/o R.M.J. v. Colvin*, No. C15-5176-BHS-JPD, 2015 WL 9647627, at *4 (W.D. Wash. Nov. 30, 2015), *R. & R. adopted sub nom.*, 2016 WL 69801 (W.D. Wash. Jan. 6, 2016) ("the regulations do not require an explicit discussion of the 20 C.F.R. § 416.927(c)[.]"). Rather, when assigning weight to a medical opinion, the ALJ should explain his decision regarding the weight given to a medical opinion to "allow[ ] a claimant or subsequent reviewer to follow the adjudicator's reasoning." 20 C.F.R. § 404.1527(f)(2); *see also Kuikka v. Berryhill*, No. 17-cv-374 (HB), 2018 WL 1342482, at *5 (D. Minn. Mar. 15, 2018). The Court finds that the ALJ has provided sufficient reasoning as to the weight given to the providers' opinions.

case." SSR 06-03P, 2006 WL 2329939, at *5. However, while "[e]vidence provided by 'other sources' must be considered by the ALJ . . . the ALJ is permitted to discount such evidence if it is inconsistent with the evidence in the record." *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 886-87 (8th Cir. 2006)); *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) ("In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record.").

Plaintiff argues that the ALJ failed to note Therapist Sego's "many marked limitations in areas such as attending to simple instructions and working with others and two extreme limitations in attending work regularly and performing at a consistent pace" with respect to his February 4, 2018 assessment. (Dkt. 28 at 12.) In addition to being cursory and unexplained, Defendant argues that Therapist Sago's opinions were contradicted by Plaintiff's treatment records and activities. (Dkt. 32 at 12-13.) As set forth previously, Therapist Sego found in his checkbox assessment that Plaintiff had marked limitations with respect to being able to understand and carry out simple instructions, maintaining attention for extended period, dealing with stress of semi-skilled and skilled work, working in coordination and proximity to others without distraction, and making simple decisions. (R. 1347.) Therapist Sego also found Plaintiff to have an extreme loss with respect to responding appropriately to changes in the workplace. (R. 1347.) In addition, Therapist Sego opined that Plaintiff had marked limitations with respect to his activities of daily living and his ability to interact with others. (*Id.*) He also had frequent deficiencies with concentration, persistence and pace. (*Id.*) The ALJ found

as follows with respect to this opinion:

> There is a listing level opinion by Lewis Sago, MA, LMFT, at Exhibit 22F and Exhibit 25F (regarding claimant's mental impairments) but it is check block opinion and unexplained. It is also not at all consistent with the amount of treatment claimant is receiving and, while the record does show some insurance problems, no long-term barriers to care are present. Consequently, if claimant had needed the intensive mental health treatment suggested by Mr. Sago, no barriers were present. As it is, claimant's mental health has been conservatively managed with outpatient counseling and medications. (Ex. B20F, B23F). Even with this conservative treatment, claimant denied memory problems or concentration difficulties, anhedonia or suicidal ideations. (Ex. B20F/80). Affect was viewed as normal and appropriate. (Ex. B20F 84, 131). Claimant remained able to perform household chores, date and care for his son. Accordingly, the opinion is given little weight.

(R. 28.)

Throughout the record Plaintiff showed that he had largely normal psychiatric examinations, outside of therapy with Therapist Sego, with an appropriate mood and affect. (*See, e.g.*, 768, 778, 891, 1112, 1173-74, 1213, 1221, 1229, 1427, 1475, 1525-26.) Plaintiff's mental assessment on September 11, 2017 with Therapist Sego showed that Plaintiff was cooperative with an expansive affect and depressed mood, but with no delusions, an intact memory and intact judgment, and moderate limitations to concentration and social interactions. (R. 1354-1359.) Plaintiff himself, albeit a year earlier than the February 4, 2018 assessment, denied mood instability, anhedonia, difficulty sleeping and concentrating, claimed he had no trouble with memory, denied being hopeless or helpless, and denied hallucinations or delusions. (R. 1170.) Even Therapist Sego admitted that Plaintiff was not in any treatment for his mental health and that none was recommended. (R. 1090.) Moreover, Therapist Sego's severe mental

limitations for Plaintiff are contrary to Plaintiff's daily activities, which included belonging to a community outreach group and the Catholic church, having a girlfriend, counting on his family for emotional support, shopping bi-weekly or more, caring for his son and his older (14-year-old) daughter, and even going so far as to address his son's mental health needs (*see*, *e.g.*, R. 579-82, 1385, 1426, 1501, 1511, 1517, 1518, 1534). *See Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) (noting that "even someone with severe physical and mental impairments may nonetheless be able to work," and affirming ALJ's decision to disregard opinions of provider favoring finding of disability where claimant's self-reported daily activities of caring for her children, preparing food, doing housework, shopping, and driving a car "showed that she could work").  Plaintiff points to evidence he asserts shows that he was unable to care for his children:

> However, this is not what the record indicates. Rather, [Plaintiff] was unable to care for his children and therapist Sego even informed [Plaintiff] that he might be obligated to make a report against him to state authorities. (R. 1568). [Plaintiff] further told therapist Sego about an incident where his daughter was putting pieces of broken glass in her mouth while in his care because he was drowsy on the bed as well as disputes with his family that resulted in the police having to intervene. (R. 1378, 1568).

(Dkt. 28 at 12-13.)  The Court agrees with Defendant that this record actually shows that his son and girlfriend had an altercation (R. 1378), and the incident regarding his daughter pertained to the mother's neglect.  (R. 1568).  In addition, while Plaintiff focuses on his physical inability to take care of his younger daughter in his reply (I. 33 at 7), no such assertion is made with respect to his minor son who he had custody over or his older daughter.  More importantly, Therapist Sego never made a report against Plaintiff related to his children, supporting Plaintiff's ability to care for his minor

children, and contradicting Therapist Sego's assessment of severe <u>mental</u> limitations.

Moreover, the weight afforded by the ALJ to the opinions of Therapist Sego and Dr. Handrich of any severe mental limitation is further supported by the conservative treatment afforded to Plaintiff in the form of sporadic medication (s*ee*, *e.g.*, R. 1090,1169, 1535), as well as therapy sessions, with no inpatient or partial hospitalization. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (physician's opinion undermined by claimant's conservative, routine course of treatment); *see also Rogers v. Berryhill*, 702 F. App'x 502, 503 (8th Cir. 2017) (taking into account the fact that the treating physicians "prescribed only conservative treatment" in the decision to discount the RFC opinion of a treating physician) (citation omitted); *Buford v. Colvin*, 824 F.3d 793, 797 (8th Cir. 2016) (finding that "conservative treatment [and] management with medicatiI... support the ALJ's RFC determination"); *Su Yang v. Berryhill*, No. 17-CV-0686 (HB), 2018 WL 1277003, at *5 (D. Minn. Mar. 12, 2018) (finding that the ALJ properly discounted the opinion of a treating physician because the claimant's "depression and other mental impairments were conservatively managed with medication, monthly medication evaluations with Dr. Bebchuk, and biweekly therapy sessions").

Given the weight to be afforded to a therapist, the nature of the check form and substantial evidence in the record supports the weight afforded by the ALJ to the Sego's opinion.

## B. Whether the ALJ "Played Doctor"

Plaintiff argues that the ALJ erred by not obtaining a new medical opinion after Plaintiff began psychiatric treatment in 2017 for major depression.  (Dkt. 28 at 13.)  As

set forth previously, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Moreover, the ALJ must "obtain an updated opinion from a medical expert only if the ALJ is of the opinion that the additional medical evidence might change the consultant's opinion." *Michael S. v. Berryhill*, No. 17-cv-5586 (TNL), 2019 WL 1430138, at *10 (D. Minn. Mar. 29, 2019). For the reasons stated forth in Sections IV.A.2-3 and IV.C of this Report and Recommendation, despite the treatment for depression in 2017 (after the 2016 state agency opinions), the Court finds that this evidence would not change the consultants' opinions based on the substantial evidence in the record as whole, including the conservative nature of the treatment of Plaintiff's mental health throughout the record coupled with his daily activities.

Plaintiff further argues that while the ALJ asserted that the RFC was more restrictive as to contact with others, this is not the case, as the RFC expands the contact afforded by the state agency experts, and therefore, the ALJ erred by only giving weight to part of the state agency 2016 opinions without any explanation. (Dkt. 28 at 13-14.) While it is not entirely clear, it appears that Plaintiff is pointing to the perceived difference with the state agency experts' opinions that Plaintiff was "restricted to work that involves brief, superficial interactions w/fellow workers, supervisors and the public" (R. 238, 277-79), with the ALJ's RFC for Plaintiff allowing "occasional superficial contact with supervisors, coworkers, and members of the public. By superficial, I mean rated no lower than an eight on the 'Selected Characteristics of Occupations' people rating." (R. 16.) The Court finds that Plaintiff is relying on immaterial semantics. In

making this argument, Plaintiff ignores the limitation to superficial contact rated no lower than an eight on the "Selected Characteristics of Occupations" people rating. "The 'people rating' expresses the degree of interaction with other people that the job requires. As explained at Appendix B to the DOT, there are nine possible function assignments for the 'People' category, and the numbering denotes, from highest (0) to lowest (8)." *Baker v. Colvin,* No. 14-CV-371-FHM, 2015 WL 5775227, at *2 (N.D. Okla. Sept. 29, 2015). By way of example, a "'people rating' of 6 for surveillance monitor indicates this job has little involvement with people." *Id.* Here the ALJ assigned the even more limited people rating—the lowest rating possible of 8. Given the restricted level of contact found by the ALJ, the Court does not agree with Plaintiff's assessment that the ALJ's RFC is in conflict with the state agency experts' opinions in a manner that is less restrictive as to contact with others.

## C. Subjective Complaints

As set forth above, the Commissioner must determine a Plaintiff's RFC based on all of the relevant evidence, including his own description of his limitations. *See Myers*, 721 F.3d at 527 (citation omitted). An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); SSR 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016) (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms). But

an ALJ need not explicitly discuss each factor. *See Goff*, 421 F.3d at 791. As such, the Court rejects any assertion by Plaintiff that a specific number of factors must be explicitly discussed (*i.e.,* over three) in order to find that an ALJ properly assessed subjective complaints.

Here, the ALJ considered Plaintiff's subjective symptoms:

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. I also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927.

(R. 16.)

Plaintiff argues that although the ALJ stated he evaluated Plaintiff's subjective pain complaints pursuant to the requirements of SSR 16-3p and 20 C.F.R. § 404.1529, a close reading of the ALJ's decision reveals otherwise, as he only considered the objective medical evidence,[8] and failed to provide multiple basis for discounting his claimed symptoms. (Dkt. 28 at 15-16.)

Plaintiff asserts that while the ALJ found that his treatment was conservative, he did not explain why the narcotics he was taking constituted a conservative treatment. (*Id.* at 19.) The ALJ weighed Plaintiff's surgeries, including the fact that he improved after his stimulator implant and thereafter was treated conservatively, mostly with medication. (R. 18-20.) An ALJ may consider evidence of effective treatment resulting in relief when assessing subjective symptoms. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir.

---

[8]    Indeed, in 2019 multiple MRIs of Plaintiff's lumbar regions showed stable degenerative changes and no significant changes from 2016. (R. 1523, 1566.)

2005) (citation omitted). The evidence in the record shows that Dr. Stulc recommended an implant of the stimulator in March 2016 for Plaintiff's pain, yet he did not return to Dr. Stulc until July 2016, and only then sought oxycodone. (R. 1330, 1048-49.) A failure to follow a recommended course of treatment also weighs against a claimant's credibility. *See Gowell v. Apfel*, 242 F.3d 793, 797 (8th Cir. 2001). After the implantation of the stimulator in February 2017, Plaintiff reported that he had "great control" of his chronic left leg pain and had begun to perform more aggressive activities. (R. 1304.) His gait strength and range of motion were largely normal at least by 2017. (*See*, *e.g.*, 1151, 1221, 1427, 1525-25, 1547.) By November 17, 2017, Dr. Stulc asserted that Plaintiff could work albeit at a "very light" level, instead of selecting even lower level of sedentary work that the ALJ assessed for Plaintiff. (R. 1086.) While the stimulator provided improvement of symptoms, Dr. Stulc noted that Plaintiff still believed he needed oxycodone for his pain.[9] (*See*, *e.g.*, R. 1217, 1282, 1290, 1304, 1474-76, 1523.) Plaintiff claimed his medications made him tired at the hearing before the ALJ (R. 151), however, as noted by the ALJ in his decision (R. 26), this claim is not

---

[9]    The Court also notes that the ALJ properly considered a secondary gain related to seeking narcotics. *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (holding that drug-seeking behavior is evidence and is relevant to a claimant's subjective complaints); *see also Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003). There is no dispute of the addictive nature of opioids. The ALJ found that there has been secondary gain drug seeking behavior, with regard to Plaintiff's complaints of pain, identified in the record. (R. 20.) Substantial evidence in the record supports that Plaintiff's focus in seeking out medical treatment was obtaining narcotic pain relief, and that  many of his frustrations stemmed from not being provided with a refill or an increased dosage of oxycodone. (*See*, *e.g.*, R. 768, 888, 1133, 1137-39, 1142-43, 1146-47, 1190, 1226-30, 1235, 1299, 1306, 1320, 1330, 1333.)

borne out by his representations to providers.  *See Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993) (ALJ did not err in discrediting claimant's testimony that her medication caused dizziness and drowsiness where the record contained no complaints of side effects to her physicians); *see also Nieves v. Saul*, No. 2:18-CV-10748, 2021 WL 941923, at *9 (D.N.J. Mar. 12, 2021).[10]  Indeed, Plaintiff denied any significant side effects taking oxycodone, which he asserted provided him with pain relief, and it was noted that his medication was at stable levels.  (See, *e.g.*, R. 1280, 1299, 1320.)  It is also important to note that the ALJ did nevertheless take into account in the RFC any distractions due to pain or possible medication side effects, though not consistently reported.  (R. 23.)

---

[10]     The court in *Nieves* found as follows:

> ALJ specifically considered Plaintiff's testimony that he experienced drowsiness and difficulty focusing as side effects of his medications, which included oxycodone, Tramadol, Flexeril, Gabapentin, and Lidoderm patches. R. 330.  However, the ALJ found that Plaintiff's "alleged effects from his medications are not corroborated by treatment records[.]"  R. 332 (citing Exhibit B8F, B11F, B13F, R. 285-98, 302-22, 574-635 (reflecting treatment from 2012 through 2017, and which does not reflect that Plaintiff ever complained about side effects from medications, and a July 2016 record, R. 597, which appears to indicate that Plaintiff did not suffer side effects from his medications ("He is taking medication wo se [without side effects]."))).  Notably, "[d]rowsiness [that] often accompanies the taking of medication, ... should not be viewed as disabling unless the record references serious functional limitations." *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002).  Although Plaintiff cites to his own hearing testimony, he points to no objective evidence in the record establishing complaints of side effects or any limitations caused by his medications.  *See generally Plaintiff's Moving Brief*, ECF No. 21.  Accordingly, the ALJ reasonably discounted Plaintiff's alleged side effects from his medications as uncorroborated.

2021 WL 941923, at *9.

In addition, the ALJ properly considered Plaintiff's daily activities. (R. 15, 25, 26.) "Evidence of daily activities that are inconsistent with allegations of disabling pain may be considered in judging the credibility of such complaints." *Reece v. Colvin*, 834 F.3d 904, 910 (8th Cir. 2016) (citing *Dunahoo v. Apfel*, 241 F.3d 1033, 1038-39 (8th Cir. 2001)). As stated previously, the record supports ALJ's position, as Plaintiff was repairing vehicles, engaging in household repairs, performing household cleaning and laundry, caring for his children (including his son's mental health needs), mowing lawns, bicycling, and putting in a tile floor. (*See, e.g.*, R. 578, 1257, 1235, 1514, 1516-17, 1534.)

As part of his subjective complaint argument, Plaintiff also attacks the decision of the ALJ to not afford his obesity proper weight in the RFC. (Dkt. 28 at 18-19.) With respect to Plaintiff's obesity, the ALJ concluded:

> The claimant does not allege limitations secondary to obesity and the treatment record does not reflect that any treating or examining medical professional has imposed limits due to the excess weight. To the extent the symptoms are influenced by the claimant's weight this has been accommodated in the residual functional capacity based on the detailed analysis set forth above.

(R. 22.) The medical record is limited with respect to Plaintiff's obesity, except for mentions that he is obese. (*See, e.g.*, 1181, 1190, 1212, 1238, 1475.) When instructed on how he could deal with weight, including diet, exercise, and medications, Plaintiff decided he was not ready to act on his obesity/weight, or at most engage in a self-directed nutrition plan. (*See, e.g.*, R. 1221-22, 1427, 1475.) A mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that

diagnosis. *Trenary*, 898 F.2d at 1364. In this case, Plaintiff has not presented, nor can this Court find any evidence in the record, supporting the assertion that his obesity necessitated any further limitations other than those considered by the ALJ. Instead, the evidence suggests, based on Plaintiff's unwillingness to do anything substantive about his weight, that it was not disabling. *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (citations omitted) (considering a plaintiff's failure to comply with suggested treatment when assessing credibility).

In addition, Plaintiff challenges the ALJ's *Polaski* analysis as to limitations resulting from his mental health. In this regard, the ALJ found as follows:

> As defined in the new regulations for the evaluation of mental impairments, a "moderate limitation" means that an individual's functioning in a particular area on a sustained basis is "fair." (12.00(F)(2)(c)) A moderate limitation does not in and of itself eliminate work. Here, the overall record in this case establishes that the claimant's sustained functioning was consistent with that level of functioning. The moderate limits in understand, remember, or apply information are accommodated for in the residual functional capacity with the limitation to simple, unskilled work. Simple work is, by definition, easier to remember and perform than say complex or detailed work. Moreover, jobs that are capable of being learned in thirty days or less guarantees that the work consists of very few, very simple steps. Again, this is clearly more easy to digest than complex work requiring significant training and education. The limit to simple unskilled work is supported by the observations of providers as discussed below and for example include the observations of normal speech, full orientation, normal cognition and intact memory.
>
> The limitation to work that requires the absolute lowest amount of human contact necessary to perform the job as defined by the "Selected Characteristic of People" rating of eight in the fifth digit of the corresponding DOT code was included in the residual functional capacity. The number eight indicates that the individual must only be able to take simple instructions from others. It requires no more ability to get along or engage in higher social functioning. This amply addressed the claimant's fair ability to function socially and, if anything, is over-limiting. The limitation in the residual functional capacity relating to the social functioning is supported by this

record as discussed below (and in the paragraph B discussion on interacting with others) and includes observations that he was pleasant, cooperative, was involved in a relationship with his girlfriend, had support from family and spent some time with his neighbor.

All of the limitations contained in the residual functional capacity but specifically the limitation to routine, repetitive simple work, with no production rate pace address the moderate limitation in concentrate, persist, or maintain pace. Further, even the limit on contact with others provides for minimal distractions from others which could be caused by coworkers. These limitations in the residual functional capacity are supported by this record as described below which include observations he was pleasant, alert, attentive to conversations, with normal attention and concentration. Further, these residual functional capacity limits would accommodate for any distractions due to pain or possible medication side effects though not consistently reported.

Finally, the moderate limits in adapt or manage oneself are addressed by the limitation to unskilled work which is repetition and routine and would require almost no adaptability to change. The low production pace also accommodates for a low stress tolerance along with the low social requirement required in the residual functional capacity. All of these limit jobs to those that require almost no ability to adapt to changes or disruption. **These limitations are supported by the record as described below and include the conservative course of treatment which has involved some erratic outpatient care but no inpatient or higher levels of care such as a day treatment program or partial hospitalization program, the ability to provide care for an infant, euthymic mood and fair to intact insight and judgment**.

(R. 22-23 (emphasis added).)

Plaintiff takes issue with the ALJ's assertion that Plaintiff is able to work in part because he appears pleasant in the record, is cooperative, and has support from his family, given the confrontations in the record with medical providers and family and the use of profane language, including during the hearing. (Dkt. 28 at 17.) The assertion that he is easily agitated and swears or yells when faced with even minimally stressful circumstances simply is not borne out by the record as a whole over a period of four

years given the multitude of contacts with the public without incident, even during stressful situations dealing with his health care and his family.  Any assertion that Plaintiff will not be able to get along with co-workers and the public is also contrary to his own representations that he did not have any problems getting along with family, friends, neighbors, that he handled stress "good/great," and that he had never been terminated from employment for being unable to get along with others, including authority figures.  (R. 581-82.)  While there is no dispute that there is evidence in the record that Plaintiff became agitated with others, the ALJ assigned Plaintiff the limitation to work that requires the absolute lowest amount of human contact necessary, and any assertion that Plaintiff cannot function with others is not borne by substantial evidence in the record as whole.

Plaintiff further argues that ALJ erred in relying on his daily activities as to his mental limitations in terms of being able to get along with others.  (Dkt. 28 at 20-21.)  However, as stated previously, Plaintiff's assertions of severe mental limitations for himself are contrary to his own representations and his daily activities, including belonging to a community outreach group and the Catholic church, having a girlfriend, being able to count on his family for emotional support, and caring for his son and daughter, even going so far as to address his son's mental health needs (including his son's inability to deal with others) with medical providers on multiple occasions.  (*See*, *e.g.*, R. 579-82, 1385, 1426, 1501-03, 1511, 1517, 1518, 1534.)

Plaintiff further argues that the ALJ failed in characterizing the level of treatment that he had for his mental health conditions as conservative.  (Dkt. 28 at 19.)  This is

incorrect, as the ALJ explicitly relied on the conservative nature of Plaintiff's mental health treatment.  (R. 23.)  As set forth in section IV.A.3, *supra*, Plaintiff's treatment for his mental health was conservative, only involving sporadic medication prescriptions and therapy sessions.  As such, the ALJ properly weighed this conservative treatment in assessing the level of mental impairment.  *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (holding that a pattern of limited and conservative treatment is a proper factor for an ALJ to consider in weighing subjective reports).

In sum, to the extent Plaintiff has cited some evidence in support of his contention that the RFC was incorrect, "substantial evidence to the contrary allowed the ALJ to make an informed decision."  *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012).  The Court will not reverse the Commissioner even if, sitting as finder of fact, it would have reached a contrary result, as "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984) (citations omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (marks and citation omitted) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.").

## D.    VE Testimony

At step five of the sequential evaluation process, the Commissioner bears the burden of showing that significant numbers of jobs exist that a person with the claimant's RFC can perform, and an ALJ "may rely on a vocational expert's response to a properly

formulated hypothetical question." *Sultan v. Barnhart*, 368 F.3d 857, 864 (8th Cir. 2004) (citation omitted).

Plaintiff contends that the ALJ's RFC limitation to simple and routine work tasks at a nonproduction rate pace is inconsistent with level 3 reasoning under the Dictionary of Occupational Titles ("DOT") (Dkt. 28 at 22.)  While it is not entirely clear, it appears that Plaintiff is arguing the VE's testimony that Plaintiff could perform work as a mail clerk was in error because the level 3 reasoning required for the position under the DOT conflicts with the RFC.  However, the ALJ did not identify this position as one that Plaintiff could perform.  (*See* R. 29-30.)  In any event, Defendant concedes that a Level 3 reasoning under the DOT is required for a document preparer (DOT 249.587-018).  (Dkt. 32 at 27.)  Level 3 reasoning is defined as having the ability to: "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations."  *See* DOT App. C (Components of the Definition Trailer), § III, 1991 WL 688702.  Plaintiff relies on *Zavalin v. Colvin*, 778 F.3d 842, 846-47 (9th Cir. 2015), which holds "that there is an apparent conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 Reasoning."  *Id.* at 847.  In its reasoning *Zavalin* noted as follows:

> We find the conflict to be plain when we consider, side-by-side, the definitions of Level 2 and Level 3 Reasoning:
>
> LEVEL 2
>
> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete

variables in or from standardized situations.

LEVEL 3

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

DOT, App. C, 1991 WL 688702. Level 2 Reasoning—applying common sense to carry out detailed but uncomplicated instructions and dealing with problems involving a few variables—seems at least as consistent with Zavalin's limitation as Level 3 Reasoning, if not more so.

*Id.*

As Plaintiff acknowledges, the Eighth Circuit has rejected the claim that such a conflict exists. *See Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007). However, Plaintiff asserts that since the decision in *Renfrow*, the Agency's position has changed, relying on the most current Vocational Expert Handbook, which provides:

An occupation with reasoning level 3 requires individuals to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." **It could be argued** that occupations requiring reasoning level 3 are too complex for an individual limited to "simple" or "repetitive" tasks. Therefore, an apparent conflict exists.

https://www.ssa.gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-508.pdf at 39 n 50 (last visited Jan. 19, 2022) (emphasis added). The Vocational Expert Handbook instructs VEs to "[b]e prepared to explain how the hypothetical individual could perform this job." *Id* at 39. Courts have found that the above language of the Social Security Administration's Vocational Expert Handbook does not make a reasoning level of 3 inherently inconsistent with a claimant's ability to perform only simple work.

*See Edwards v. Comm'r*, Civil Action No. 4:18-CV-372, 2019 WL 4564833, at *2-3 (E.D. Tex. Sept. 20, 2019).

Further, it is important to emphasize that the Vocational Expert Handbook guides vocational experts in identifying conflicts for the ALJ. *See Courtney v. Comm'r, SSA*, 894 F.3d 1000, 1005, n.2 (8th Cir. 2018). "The handbook does not direct the ALJ or the ALJ's determination[.]" *Edwards v. Comm'r, SSA*, No. 4:18-CV-372, 2019 WL 4564833, at *2 (E.D. Tex. Sept. 20, 2019).

Given that the Vocational Expert Handbook does not direct the ALJ and in view of the holding by the Eighth Circuit in *Renfrow*, *supra*, the Court does not find a conflict. *See Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) ("The District Court . . . is bound . . . to apply the precedent of this Circuit.").

In any event, this argument is largely academic, as the two additional jobs identified by the vocational expert and the ALJ – of addressor, DOT#209.587-010, 13,000 jobs nationally; and cutter/paster, press clippings, DOT#249.587- 014, 7,500 jobs nationally, both of which require a reasoning level of 2 – align with the RFC found by the ALJ given that a reasoning level of two is generally found to be consistent with a claimant's ability to understand simple instructions and perform simple tasks under the reasoning set forth by *Zavalin*, *supra*. As argued by Defendant, these level two jobs numbered 20,500 nationally, which is a significant number. *See Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 jobs nationally was significant).

Plaintiff next argues that the Occupational Outlook Handbook ("OOH") sets forth that the document preparer position job "is currently performed in an office setting which

would clearly rise beyond superficial contact with coworkers and supervisors." (Dkt. 28 at 24.) Even assuming that this is what the OOH provides for the document preparer position (as the Court cannot find an entry for this position in the OOH),[11] Plaintiff points to nothing except for his own supposition that a position in an office could never have the limited contact as provided for in his RFC. Moreover, the Court rejects this argument as "[a]n ALJ is not required to address apparent conflicts between the VE's testimony and the Occupational Outlook Handbook." *Best v. Berryhill*, No. 4:16-CV-268-D, 2017 WL 6626320, at *1 (E.D.N.C. Dec. 28, 2017) (collecting cases).

Plaintiff also relies on the fact that all of the positions at issue fall under work field 231, which he claims requires participating as a member of a team and serving clients and customers. (Dkt. 28 at 24.) Again, even assuming that this is a correct characterization of the job field (a proposition for which Plaintiff provides no authority, nor can this Court find any), what Plaintiff is suggesting is that the Court rely on a general code as to a wider field of positions instead of the more specific level of interaction required with others as set forth in the DOT <u>for the specific</u> document preparer, DOT#249.587-018; addressor, DOT#209.587-010; and cutter/paster, press clippings, DOT#249.587- 014 positions.[12] The DOT sections for all these positions provides that interactions with

---

[11]    Indeed, Plaintiff concedes in his reply that the OOH does not have entries for any of the positions at issue. (Dkt. 33 at 1.)

[12]    The same is true for Plaintiff's reliance (Dkt. 28 at 24-25) on the GOE Work Group Category 07.05 for records processing, under which document preparer falls pursuant to the "Selected Characteristics of Occupations," and which provides:

> Occupations in this group are concerned with preparing, reviewing, filing, routing, and distributing recorded information; verifying or proofing records

others is "Not Significant."  The Court cannot find that the VE's testimony is inconsistent with the DOT on this basis.

Plaintiff also takes issue with any assertion that the job of press clippings cutter/paster still exists in significant numbers in either the regional or national economy and argues that no reasonable mind could conclude that the VE's testimony as to the number of such jobs in the regional economy is reliable.  (Dkt. 28 at 26-27.)  In support of this position, Plaintiff relies on the fact that the DOT has not been updated since 1991, as it has been replaced by a website, O*NET, in which the press clippings cutter/paster job described in the DOT does not exist "either in an identical or substantially similar fashion," thereby "suggesting that the position no longer exists in significant numbers in the economy."  (*Id.*)  Plaintiff makes a similar argument for the addressor position.  (*Id.* at 27.)  The SSA's own regulations and guidance allow for an ALJ to rely on a VE's testimony that takes into account the DOT, and there is no requirement that the VE's testimony be consistent with O*Net.  *See* 20 C.F.R. § 4041566(d); SSR 00-4P, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000) ("In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy.")  Indeed, the SSA has

_____

for accuracy; and scheduling the activities of people or the use of equipment. Skills and abilities required generally include: Planning or directing work of others; gathering, organizing, and recording numerical or other information accurately; analyzing and classifying documents following established procedures; recognizing errors in printed copy; adjusting to work that is routine or repetitive; and routing or distributing information or records.

07.05. Records processing, SCODICOT 07.05.

determined that O*NET "is not suitable" as a vocational resource for disability

adjudication.  *See* Occupational Information Development Advisory Panel, A Review of

the National Academy of Sciences Report a Database for a Changing Economy: Review

of the Occupational Information Network (O*NET), at 1-2 (June 28, 2010), available at

https://www.ssa.gov/oidap/Documents/COMPLETE%20FINAL--Findings%20Report%

20OIDAP%20062810.pdf (last visited Jan. 19, 2022).  Further, the Eighth Circuit has

recently reaffirmed that even though the DOT has not been updated since 1991, an ALJ

does not err in considering the VE's testimony, which relies in part on the DOT.  *See*

*Medved v. Kijakazi*, 855 F. App'x 311 (8th Cir. 2021) (per curium).

Plaintiff also relies upon the "temperaments" sections in the U.S. Department of

Labor's publication "The Revised Handbook for Analyzing Jobs" (published in 1991) for

the DOT 249.587-018, DOT 249.587-014, and DOT 209.587-010 positions, which he

claims provides that each of these positions require performing repetitive work or

performing continuously the same work, according to set procedures, sequence or pace,

and is in conflict with the RFC's prohibition on pace or production work.  (Dkt. 28 at 24,

26, 27.)  However, the ALJ is not required to resolve conflicts between the expert's

testimony of a suitable job and requirements which are described by a source not listed in

the regulations, including information provided in that Handbook.  *See Catherine P. v.*

*Saul*, No. 2:20-CV-00481-PD, 2021 WL 698195, at *7 (C.D. Cal. Feb. 23, 2021) (citing

*Lewis v. Berryhill*, 708 F. App'x 919, 920 (9th Cir. 2018)); *see also Stromske v. Colvin*,

No. 14-CV-1243-CJP, 2015 WL 6750057, at *5 (S.D. Ill. Nov. 5, 2015).

For all of these reasons, the Court finds that the ALJ properly relied on the testimony of the VE.[13]

## V.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, IT IS

**HEREBY RECOMMENDED THAT**:

1.    Plaintiff Nicolas J.'s Motion for Summary Judgment (Dkt. 27) be

**DENIED**;

2.    Defendant Acting Commissioner of Social Security Kilolo Kijakazi's

Motion for Summary Judgment (Dkt. 31) be **GRANTED**; and

3.    That the case be **DISMISSED WITH PREJUDICE**.

DATED: January 20, 2022                    *s/Elizabeth Cowan Wright*
                                           ELIZABETH COWAN WRIGHT
                                           United States Magistrate Judge

---

[13]    The Court notes that while Plaintiff's arguments regarding resources outside of the DOT and the SCO may have been persuasive at the hearing before the ALJ and when examining the VE, Plaintiff did not raise these arguments at that hearing (which Plaintiff does not contest (Dkt. 28 at 22; *see also* R. 72-73)). This amounts to waiver of these arguments. In the context of a Social Security disability proceeding, the Eighth Circuit has held that failure to raise a claim to the ALJ results in waiver of the claim on appeal. *See Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003). The Supreme Court also reaffirmed more recently that a person is entitled to relief only if he or she "makes a timely challenge" to the administrative body for relief. *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018) (citation omitted); *see also Shaibi v. Berryhill*, 883 F.3d 1102, 1108-10 (9th Cir. 2017) (holding that claimant forfeited argument that VE's testimony conflicted with handbooks containing occupational data because claimant's attorney failed to ask VE "the evidentiary basis for his [job number] estimates" and did not "cross-examine the VE as to the accuracy of those estimates, or challenge that accuracy before the Appeals Council.").

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).